OPTICAL DISC CORPORATION,
Plaintiff–Appellant,

v.

DEL MAR AVIONICS and Bruce Del
Mar, Defendants–Appellees.

No. 99–1225.

United States Court of Appeals,
Federal Circuit.

April 7, 2000

ent is directed to a method and an apparatus for improving the quality of compact optical discs.

We affirm-in-part, vacate-in-part, and remand. Specifically, we (1) affirm the district court's grant of summary judgment of no literal infringement of claims 1, 3–11, 13–20, 22, and 23; (2) vacate the grant of summary judgment of noninfringement of the same claims under the doctrine of equivalents and remand for further proceedings; and (3) vacate the grant of summary judgment of noninfringement of claims 21 and 24 and remand for further proceedings directed to both literal infringement and infringement under the doctrine of equivalents.

## BACKGROUND

### I. The Technology Involved

A compact disc (CD) can be used to store digitized data, such as music, video, or computer data, for later playback or retrieval. In order to retrieve the data on a CD, the surface of the CD is optically scanned. For example, a music CD contains digitized data representing recorded music. A person wishing to hear the music inserts the CD into a CD player, where the data on the CD is optically read during playback. The CD player rotates the CD so that the "read head" of the player can retrieve the digitized data and the recorded music can be heard. Laser beams usually are used to read the data on a CD.

The first step in the production of a CD is the creation of a master CD with data on it. Data is written onto the master CD, or recorded on it, by making physical alterations in the surface of the disc. These alterations are known as "surface effects." Normally, laser beams are used to write data onto the surface of a master CD. "Pits" are the most common form of surface alteration used to write information onto a disc. Between each pit on the disc is an unaltered area known as the "land." When the recording process is completed, a master CD will contain millions of pits

James A. McQueen, Graham & James LLP, of Costa Mesa, California, argued for plaintiff-appellant. Of counsel on the brief was Stephen J. Koundakjian.

Craig Y. Allison, Brobeck Phleger & Harrison LLP, of Los Angeles, California, argued for defendants-appellees. With him on the brief were William E. Trautman, of San Francisco, California; Douglas C. Rawles of Los Angeles, California; and Robert G. Kramer and Pamela B. Hiatt, of Palo Alto, California.

Before PLAGER, SCHALL, and GAJARSA, Circuit Judges.

SCHALL, Circuit Judge.

Optical Disc Corporation (ODC) appeals from the decision of the United States District Court for the Central District of California that granted summary judgment of noninfringement (both literal and under the doctrine of equivalents) in favor of Del Mar Avionics and Bruce Del Mar (collectively Del Mar) in ODC's suit against Del Mar for infringement of claims 1, 3–11, and 13–24 of U.S. Patent No. 5,297,129 (the '129 patent). *See Optical Disc Corp. v. Del Mar Avionics,* No. CV–97–650 (C.D.Cal. Dec. 17, 1998). ODC is the assignee of the '129 patent. The pat-

and lands. The boundary between a pit and land is called a "transition." The information stored on the CD is contained in the transitions between the pits and lands and in the distance between transitions.

After a master CD with data on it has been created, a metal layer typically is deposited on top of the disc in order to make an inverse image of it. The metallized inverse copy of the master CD, called a "stamper," then is separated from the master disc. The stamper is used to mold multiple copies of the original master CD for distribution and sale. These copies are exact replicas of the master CD.

One method for creating surface effects on a master CD is the "thermal dye polymer process." In thermal dye polymer processing, pits are directly formed on the CD by a laser beam. First, a coating of polymeric thermoactive dye is placed on the surface of the blank master CD. Next, a focused laser "writing beam" is applied to the CD surface. When the laser beam hits the surface of the CD, it thermally heats the dye polymer layer. The heat generated by the laser beam impinging on the surface of the CD creates the pit directly because, when the dye polymer layer reaches a certain "threshold temperature," it changes from a solid into a gas. This leaves a pit in the dye polymer layer. A pit's "leading edge" is the area on the disc where heat generated by the laser beam begins to exceed the threshold temperature and therefore starts to form a pit on the surface of the disc. If it does so gradually, it creates a tapered, or "canoe" shaped, leading edge where the pit starts. The same pit's "trailing edge" is the area on the disc where heat generated by the laser beam decreases below the threshold temperature, either abruptly or gradually. Consequently, the depth of the pit decreases, either abruptly or gradually, and the pit ends. When the laser beam is turned off or the power output falls below the threshold abruptly, a rather blunt semicircular, or "hot dog" shaped, trailing end on the trailing edge of the pit is created because the downstream portion of the revolving disc is cold. However, if the laser beam's output power is reduced in a controlled manner from a power level above the threshold to a power level below the threshold, a tapered canoe shape at the trailing edge of the pit is formed.

In the thermal dye polymer process, the laser beam is "modulated" (i.e., controlled) by a "modulator drive signal" that is derived from the data to be stored on the disc. For example, as the amplitude of the modulator drive signal increases, the output power of the laser will increase correspondingly. In other words, the laser beam power output "copies" the modulator drive signal in order to record data on the disc surface.

A "write strategy" for converting the data (such as music) to be stored on a master CD into a corresponding series of pits and lands on the disc is necessary in order to achieve the particular pit shape symmetry and "duty cycle" that is desired. The "duty cycle" is the ratio of pit size to land size. For example, a duty cycle of 50% would be a symmetrical signal with the pits occupying 50% of the area and the land occupying the other 50%. The write strategy employed will depend on a number of factors. The write strategy is reflected in the modulator drive signal.

The ability of a CD player to read the data stored on a CD depends upon the ability of the player to "see" the transitions between pits and lands. For accurate retrieval of data from a CD, the pits should have geometric symmetry. In other words, the shape of the trailing edge of each pit should closely resemble the shape of the leading edge of the pit. Certain types of CD players experience tracking problems if the pit has edges that are blunt (hot dog shaped) rather than edges that are tapered (canoe shaped). Therefore, a CD having pits with geometrically symmetrical tapered edges is desirable.

## II. The '129 patent

The '129 patent is directed to a method and apparatus for improving the quality of CDs by creating master CDs having pits with geometrically symmetrical leading

and trailing edges. The patent describes the modulation of a laser write beam in response to a modulator drive signal containing information to be recorded onto the master CD. The laser beam forms a track of surface effects or "indicia" (i.e., pits) in the moving optical disc when the writing beam power is above the threshold for altering the disc surface, and does not form surface effects when the writing beam is below the threshold. *See* '129 patent, col. 2, l. 39—col. 3, l. 5. According to the patent, a "uniquely shaped modulator drive signal" is provided to vary the power of the laser writing beam above and below the threshold. *See id.* at col. 7, ll. 3–15. The patent asserts that its shaped modulator drive signal improves the characteristics of the surface effects recorded on the master CD. *See id.* at col. 7, ll. 8–9, 24–34.

The "SUMMARY OF THE INVENTION" states that the invention provides "a modulator drive signal to modulate the light beam, and produces therefrom a shaped modulator drive signal having steep leading edges reaching a first level sufficient to cause the writing beam to have an intensity above the threshold of the moving medium [ (the disc) ], and having ramped trailing edges changing in amplitude at a prescribed rate to reach a second level sufficient to cause the writing beam to have an intensity below the threshold of the moving medium." *Id.* at col. 7, ll. 4–12. The written description explains that "[s]ince the trailing edges of the shaped modulator drive signal fall according to a prescribed ramp function, *the temperature of the medium [ (the dye polymer layer on the disc) ] does not drop as abruptly as it would with steep falling edges of prior art modulating drive pulses, and the trailing edges thus also exhibits [sic] the 'canoe-shaped' characteristic.*"

*Id.* at col. 7, ll. 34–40 (emphasis added). In this manner, a master CD is formed that has pits with leading and trailing edges that are symmetrical.

The method and apparatus of the '129 patent are illustrated in Figures 1 and 3 of the patent. Figure 1 is a "generalized" block diagram of a recording apparatus for carrying out the objectives of the invention. The recording apparatus is designed for recording information on a rotating disc-shaped medium 1. *See id.* at col. 8, ll. 10–12. The disc is rotated by a spindle motor 3 which is controlled by a speed controller 5. *See id.* at col. 8, ll. 12–13. A laser or other high density light source 7 forms a writing beam 9 of a particular wavelength of light. The writing beam then passes through an optical modulator 11, which varies the intensity of the beam in accordance with a drive signal shown on line 10. *See id.* at col. 8, ll. 17–21. The drive signal for the optical modulator is formed by a waveform shaping circuit 31. The waveform shaping circuit has an input 33 for receiving the information to be recorded on the disc, such as music. *See id.* at col. 8, ll. 42–45. The waveform shaping circuit provides a modified shaped modulator drive signal to the optical modulator. According to the written description, the provided signal has "the ability to provide higher peak power, good symmetry, the desired duty cycle, and tapered leading and trailing edges of the pits for improved tracking." *Id.* at col. 10, l. 68—col. 11, l. 3. The light beam 13 that leaves the optical modulator has an amplitude of modulation that is proportional to the amplitude of the drive signal formed by the waveform shaping circuit. *See id.* at col. 8, ll. 24–26. Upon leaving the optical modulator, the modulated beam is directed to the disc and is focused to a spot 15 by appropriate optics 19 and 17.

## FIG. I

Figure 3 of the '129 patent illustrates the shapes of pits formed on the surface of a disc as a result of different waveforms. *See id.* at col. 9, ll. 15–19. The waveform of the invention of the '129 patent is seen at C1 in Figure 3. The written description states that "[t]he fact that the trailing edge of the waveform in Line C1 of Fig. 3 is ramped means that the amplitude of waveform C1 can be varied quite easily resulting in a great effect on the leading edge of the pit while having only a small effect on the trailing edge . . . ." *Id.* at col. 10, ll. 24–29. The written description points out that waveform C1 results in pits with symmetrical tapered leading and trailing edges, as seen at line C3 of Figure 3, which results in improved quality. *See id.* at col. 10, l. 47—col. 11, l. 3.

The written description explains that, in contrast, the rectangular waveform shown

at line A1 on Figure 3 results in a pit, shown at line A3, that has a tapered leading edge and a blunt trailing edge. *See id.* at col. 9, ll. 20–37. The written description also contrasts the invention's ramped waveform with a waveform resulting from a stepped modulator drive signal, shown at line B1 of Figure 3. The waveform B1 increases the amplitude of the drive signal's leading edge to a higher level than normal in order to form a pit with a more blunt leading edge. *See id.* at col. 9, ll. 39–42. However, if the entire pulse was at this higher level, the pit trailing edge would be excessively wide. *See id.* at col. 9, ll. 44–46. In order to prevent this, the drive signal is later reduced to the normal power level and the timing of the trailing edge is purposefully shortened to compensate for the increased power level at the leading edge. *See id.* at col. 9, ll. 46–52. As a result, a pit that maintains the desired duty cycle and that has good symmetry is formed. *See id.* at col. 9, ll. 52–56. The written description notes that, while the stepped modulator drive signal B1 results in good pit symmetry (B3), the pits have blunt ends, making tracking difficult for some players. *See id.* at col. 9, ll. 52–58. Thus, according to the written description, "waveform B1 solves one problem but creates another." *Id.* at col. 9, ll. 59–60.

**FIG. 3**

The claims of the '129 patent that are at issue may be divided into two groups—the "Trailing Edge Claims" and the "Time Above Threshold Claims." Claims 1, 3–11, 13–20, 22, and 23 recite a modulator drive signal having "ramped trailing edges" and will be referred to as the "Trailing Edge Claims." Claims 21 and 24 recite a modulator drive signal that "decreases the time the ... signal is above the threshold" and will be referred to as the "Time Above Threshold Claims."

Of the Trailing Edge Claims, claims 1, 11, and 22 are independent. Claim 1 is representative; it recites:

1. A waveform shaping circuit for use in an optical recording apparatus

which includes a writing light beam source and an optical modulator for modulating the intensity of the writing beam of light above and below a threshold level of a moving recording medium in response to a modulator drive signal for recording information on the medium, the light beam being capable of forming a track of surface effects in the moving recording medium when the writing beam is above the threshold and incapable of forming said track of surface effects in the moving recording medium when the writing beam is below the threshold, said waveform shaping circuit comprising:

delay means for receiving a substantially rectangular waveform having leading and trailing edges, provided as said modulator drive signal to modulate the writing beam, and for delaying said leading edges while passing said trailing edges undelayed; and

*waveform shaping means* coupled to said delay means *for producing a shaped modulator drive signal* having steep leading edges reaching a first level sufficient to cause said writing beam to have an intensity above the threshold of the moving medium, and *having ramped trailing edges changing amplitude at a prescribed rate* to reach a second level sufficient to cause said writing beam to have an intensity below the threshold of the moving medium prior in time to the occurrence of the respective next leading edges of the received rectangular waveform.

'129 patent, col. 12, l. 63—col. 13, l. 25 (emphasis added).

The Time Above Threshold Claims are independent claims 21 and 24. Claim 21 is an apparatus claim and claim 24 is a method claim. Claim 21 is representative; it recites:

21. A waveform shaping circuit for use in an optical recording apparatus which includes a writing light beam source and an optical modulator for modulating the intensity of the writing beam of light above and below a threshold level of a moving recording medium in response to a modulator drive signal for recording information on the medium, the light beam being capable of forming a track of surface effects in the moving recording medium when the writing beam is above threshold and incapable of forming said track of surface effects in the moving recording medium when the writing beam is below threshold, said waveform shaping circuit comprising:

means for receiving a substantially rectangular waveform having leading and trailing edges, provided as said modulator drive signal to modulate the writing beam to a peak power above threshold and to a minimum power level below threshold, respectively; and

*waveform shaping means* coupled to said receiving means for producing a shaped modulator drive signal *which* increases the peak power of the writing beam responsive to the occurrence of said leading edges, *decreases the time said shaped modulator drive signal is above the threshold* to maintain a prescribed duty cycle in the track of surface effects in the moving recording medium, and produces a symmetrical geometry at the leading and trailing edges of said track of said surface effects.

'129 patent, col. 15, ll. 40–68 (emphasis added).

## III. ODC's Lawsuit Against Del Mar

Del Mar has developed a product called the "FireTrac" CD mastering system. Like the invention of the '129 patent, the FireTrac system uses thermal dye polymer processing to make master CDs. The FireTrac system does not use a single-step trailing edge in its modulator drive signal, as shown, for example, in line B1 of Figure 3 above. Instead, it uses a double-step at the trailing edge of its modulator drive signal.

On January 31, 1997, ODC sued Del Mar for infringement of the '129 patent, alleging that the FireTrac system infringed claims 1, 3–11, and 13–24. In due

course, Scott M. Golding, Del Mar's Vice President of Technical Operations, and Patrick Joyce, the Del Mar employee who designed the FireTrac circuitry, were deposed by ODC. Shortly thereafter, Richard L. Wilkinson, ODC's President and a co-inventor on the '129 patent, was deposed. On October 16, 1997, Del Mar moved for summary judgment of noninfringement.

On May 5 and 6, 1998, while Del Mar's motion for summary judgment was pending, ODC deposed Mr. Joyce a second time. In addition, on May 7, 1998, Del Mar allowed Thomas D. Milster, Ph.D., an ODC expert, to conduct an inspection of the FireTrac system. However, Dr. Milster was not able to inspect the master CD that was written during the inspection in order to determine whether the pits formed by the FireTrac system had symmetric canoe shapes.[1] Subsequently, on June 5, 1998, Dr. Milster submitted a five-page declaration and a 57–page "Inspection Report." In his report, Dr. Milster summarized the findings from his inspection of the FireTrac apparatus. Based upon his inspection of the FireTrac device, Dr. Milster concluded that the FireTrac system meets all limitations of the asserted claims, either literally or under the doctrine of equivalents.

On October 16, 1998, Del Mar renewed its motion for summary judgment of noninfringement. In addition, in two separate motions, it moved for summary judgment of invalidity. On December 9, 1998, the renewed motion for summary judgment was taken under submission by the district court without oral argument. Eight days later, the court granted the motion. However, it declined to rule on Del Mar's separate motions challenging the validity of the '129 patent.

In its decision, the district court did not articulate a construction of the claims of the '129 patent. Rather, it proceeded immediately to the issue of literal infringement of the Trailing Edge Claims. Concluding that there were no material facts in dispute, the court determined, as a matter of law, that these claims were not literally infringed because of the absence, in Del Mar's FireTrac system, of a ramped signal.[2]

Turning to the issue of infringement of the Trailing Edge Claims under the doctrine of equivalents, the district court analogized the case to *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 47 USPQ2d 1829 (Fed.Cir. 1998). Thus, the court reasoned that because "ODC specifically touted the advantages of their ramped signal as superior to the step signal of prior art .... [its] attempt to now argue that the ramp shape is not a requirement is ... unpersuasive." *Optical Disc,* slip op. at 7–8. The court determined that the FireTrac system could not infringe because it "uses a two-step signal, not a ramp." *Optical Disc,* slip op. at 9.

The district court next addressed infringement of claims 21 and 24 of the '129 patent, the Time Above Threshold Claims. The court framed the issue by stating, "The dispute is over whether ODC has presented sufficient evidence of infringement of [the time above threshold] limitation to avoid summary judgement [sic]." *Optical Disc,* slip op. at 9. In that regard, the court considered the testimony of Mr. Joyce and Dr. Milster's report. Although

---

1. From the record before us, it appears that the parties entered into an arrangement pursuant to which the disc created on May 7 would be evaluated by an independent expert, with the results of the evaluation being provided to both parties before Dr. Milster examined the disc. The briefs on appeal suggest that the parties have not yet reached an agreement on the details of the independent evaluation.

2. Based on the record before us, it appears that the parties' only dispute with respect to infringement of the Trailing Edge Claims was whether or not the claim limitation of a "shaped modulator drive signal" having "ramped trailing edges" was met in the FireTrac system. In its decision, the district court focused solely on this limitation, and on appeal, the parties only dispute the presence or absence of a ramped trailing edge in the accused FireTrac system.

noting that the Milster report "shows that the 'main part of the modulator pulse of the FireTrac is in fact foreshortened,'" the court reasoned that because the "main part" was "only one component of the modulator drive signal" and because "Joyce clearly testified that there was no differential delay of the leading and trailing edges of the pulses," ODC had failed to come forward with sufficient evidence to create a triable issue for the jury either in terms of literal infringement or infringement under the doctrine of equivalents. *Id.*

ODC timely appealed the district court's grant of summary judgment. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (1994).

## DISCUSSION

### I. Standard of Review

A district court's grant of summary judgment is reviewed *de novo. See Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir. 1994). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. However, in determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the nonmoving party, which in this case is ODC, *see Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F.3d 1270, 1274, 35 USPQ2d 1035, 1038 (Fed. Cir.1995), and all reasonable inferences must be drawn in the nonmovant's favor, *see Marquip, Inc. v. Fosber Am., Inc.,* 198 F.3d 1363, 1366, 53 USPQ2d 1015, 1018 (Fed.Cir.1999). On appeal, ODC challenges the district court's grant of summary judgment with respect to both the Trailing Edge Claims and the Time Above Threshold Claims.

### II. The Trailing Edge Claims

As far as the Trailing Edge Claims are concerned, ODC does not contend that the district court erred in holding that the claims were not literally infringed. Rather, it argues that the district court erred in granting summary judgment of noninfringement under the doctrine of equivalents. According to ODC, the district court failed to conduct a proper equivalency analysis. ODC also argues that the district court failed to view the evidence in the light most favorable to it and that genuine issues of material fact preclude summary judgment in Del Mar's favor. In particular, ODC points to Dr. Milster's opinion that the FireTrac double-step drive pulses are equivalent to the ramped trailing edge waveform disclosed in the '129 patent.

Del Mar responds that there are no genuine issues of material fact, and that ODC was given numerous opportunities to come forward with sufficient evidence of infringement but failed to do so. Del Mar also contends that the FireTrac's stepped signal cannot be equivalent to the ramped trailing edge waveform of the '129 patent because such a theory of equivalents would write an essential limitation—the "ramped trailing edges"—out of the Trailing Edge Claims. Del Mar argues that this case presents a straightforward application of *Tronzo v. Biomet.*

For the following reasons, we conclude that the district court erred in its grant of summary judgment in favor of Del Mar with respect to noninfringement of the Trailing Edge Claims under the doctrine of equivalents.

▪ Infringement analysis involves two steps. *See Young Dental Mfg. Co. v. Q3 Special Prods., Inc.,* 112 F.3d 1137, 1141, 42 USPQ2d 1589, 1592 (Fed.Cir.1997). First, the claim scope is determined without regard to the accused device. *See id.* This first step is a question of law and is reviewed *de novo. See id.* Second, the properly construed claim is compared with

the accused device to determine whether all of the claim limitations are present either literally or by equivalent. *See id.* This second step is a question of fact. *See id.*

■ In interpreting an asserted claim, we look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history.[3] *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir.1996). Usually, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. *See id.* at 1583, 39 USPQ2d at 1577. However, extrinsic evidence may be considered if needed to assist in determining the meaning or scope of technical terms in the claims. *See id.*

As noted above, the district court did not articulate a construction of the claims of the '129 patent. However, a reading of the district court's opinion compels the conclusion that, in order to find no literal infringement of the Trailing Edge Claims, the court had to construe the "ramped trailing edges" limitation as requiring a modulator drive signal that falls to a lower level at a constant rate because it is "ramped." The court stated: "The patent distinguishes the step signal of prior art from its innovative ramp signal. FireTrac uses a two-step signal, not a ramp."[4] *Optical Disc,* slip op. at. 8–9.

ODC argues that the "ramped trailing edges" of the modulator drive signal should be construed as "a drive signal pulse trailing edge which moderates its decrease in laser power from a write level to a base level, over time, to produce a less abrupt passage through the thermal threshold of the moving medium." Del

Mar contends that we should construe the "ramped trailing edges" of the modulator drive signal as a signal that "increases or decreases smoothly from one level to another."

We begin the claim construction process by considering the words of the claim itself. *See Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 619–20, 34 USPQ2d 1816, 1819 (Fed.Cir.1995). As already noted, claim 1 of the '129 patent is representative of the Trailing Edge Claims. It recites, in pertinent part, a:

> *waveform shaping means* coupled to said delay means *for producing a shaped modulator drive signal* having steep leading edges reaching a first level sufficient to cause said writing beam to have an intensity above the threshold of the moving medium, and *having ramped trailing edges changing amplitude at a prescribed rate to reach a second level sufficient to cause said writing beam to have an intensity below the threshold of the moving medium* prior in time to the occurrence of the respective next leading edges of the received rectangular waveform.

'129 patent, col. 13, ll. 14–25 (emphasis added).

■ Without evidence in the patent specification of an express intent to impart a novel meaning to a claim term, the term takes on its ordinary meaning. *See Kegel Co. v. AMF Bowling, Inc.* 127 F.3d 1420, 1427, 44 USPQ2d 1123, 1127 (Fed.Cir. 1997); *see also Hoechst Celanese Corp. v. BP Chemicals Ltd.,* 78 F.3d 1575, 1578, 38 USPQ2d 1126, 1129 (Fed.Cir.1996) ("A technical term used in a patent document is interpreted as having the meaning that

---

**3.** The claims of the '129 patent were issued substantially as filed, and neither party relies on prosecution history.

**4.** This is not a case requiring us to vacate the district court's judgment of noninfringement on the ground that the court's opinion is "absolutely devoid of any discussion of claim construction." *Graco, Inc. v. Binks Mfg. Co.,*

60 F.3d 785, 791, 35 USPQ2d 1255, 1259 (Fed.Cir.1995). Here, in the course of its analysis, the district court cited *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970–71, 34 USPQ2d 1321, 1328 (Fed.Cir.1995), for the proposition that claim construction is a matter of law for the court and, as just seen, inferentially set forth its view of the scope of the claims of the '129 patent.

it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning."). For such ordinary meaning, we turn to the dictionary definition of the term. *See Vitronics,* 90 F.3d at 1584 n. 6, 39 USPQ2d at 1578 n. 6 ("Although . . . dictionaries fall within the category of extrinsic evidence, as they do not form a part of an integrated patent document, they are worthy of special note. Judges . . . may . . . rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."). The meaning of "ramped" is "to rise or fall to a higher or lower level." Webster's Third New International Dictionary 1879 (1986). Also, a "ramp" is defined as "[a] voltage or current that varies at a constant rate." Modern Dictionary of Electronics 822 (6th ed.1997). Thus, the use of the word "ramped" indicates that, in the Trailing Edge Claims, the inventors intended to claim a "shaped modulator drive signal" that falls to a lower level at a constant rate.

Turning to the specification, the "SUMMARY OF THE INVENTION" states that, "[s]ince the trailing edges of the shaped modulator drive signal fall according to a prescribed ramp function, *the temperature of the medium does not drop as abruptly as it would with steep falling edges of prior art modulating drive pulses, and the trailing edges thus also exhibits the 'canoe-shaped' characteristic."* '129 patent, col. 7, ll. 34–40 (emphasis added). The "DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT" states that *"the trailing edge of the pit is also tapered due to the sloping falling edge of the modulating drive signal passing through threshold less abruptly than the rectangular pulses [of the prior art]." Id.* at col. 10, ll. 50–53 (emphasis added). According to the written description, *"the threshold level for the materials [i.e., the dye polymer layer] is actually an expo-sure level," id.* at col. 1, l. 62—col. 2, l. 2 (emphasis added), and the width of the recorded pit *"increases with time due primarily to the temperature of the medium increasing with time . . . ." Id.* at col. 2, ll. 53–54 (emphasis added). In other words, the ramped trailing edge signal, which falls to a lower level at a constant rate, causes the temperature of the medium to fall less abruptly and pass through the threshold less abruptly than the single-step trailing edge of the prior art and, in so doing, it causes the trailing edge of the pit to become tapered in a "canoe shape." Thus, we agree with ODC's claim construction.

■ As noted above, ODC does not challenge the district court's grant of summary judgment of no literal infringement of the Trailing Edge Claims. It is undisputed that the claim limitation of a "shaped modulator drive signal" having "ramped trailing edges" is not literally present in the accused FireTrac device. The FireTrac waveform has a double-step trailing edge, not a ramped trailing edge.

■ However, "[a] device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if every element in the claim is literally or equivalently present in the accused device." *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1423, 44 USPQ2d 1103, 1106 (Fed.Cir.1997). "A claim element is equivalently present in an accused device if only 'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused device." *Id.* "Whether a component in the accused subject matter performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result may be relevant to this determination." *Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d 1309, 1315, 47 USPQ2d 1272, 1276 (Fed.Cir.1998).

■ Summary judgment of noninfringement under the doctrine of equivalents is

proper if no reasonable jury could determine that a claim limitation is met in the accused device by an equivalent. *See Warner–Jenkinson Co. v. Hilton–Davis Chemical Co.*, 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1875 n. 8 (1997); *Sage Prods.*, 126 F.3d at 1423, 44 USPQ2d at 1106 ("Although equivalence is a factual matter normally reserved for a fact finder, the trial court should grant summary judgment in any case where no reasonable fact finder could find equivalence.").

■■■ ODC argues that, in the district court, it raised a genuine issue of material fact as to whether the FireTrac system infringed the Trailing Edge Claims under the doctrine of equivalents. In making this argument, it points to Dr. Milster's declaration and accompanying Inspection Report.

Based upon his inspection of the FireTrac device, Dr. Milster expressed the opinion that the system met all limitations of the asserted claims by equivalence. In arriving at that opinion, he performed a limitation by limitation comparison of independent claims 1, 11 and 22 of the '129 patent to the accused FireTrac device, and his report contains a detailed "function-way-result" doctrine of equivalents analysis of the FireTrac waveform's trailing edges. Dr. Milster expressed the opinion that the FireTrac trailing edge double-step waveform is equivalent to the claimed ramped trailing edge waveform. More specifically, in his declaration, he stated that he believed that the FireTrac waveform was equivalent to the modulator drive signal of the '129 patent because "its *function* is to change the thermal profile at the ablative surface of the dye-polymer disc master in the region of the trailing edge of the pit being formed in that sur-

face, by *means* of progressively reducing the energy delivered to that surface in that region, to *result* in controlling the shape of the trailing edge of that pit."[5] No evidence was offered by Del Mar in rebuttal.

Clearly there is a genuine issue of material fact as to whether the claim limitation of "ramped trailing edges" is met in the FireTrac system by an equivalent. On the current state of the record, a reasonable jury could determine that the "ramped trailing edges" claim limitation is met in the FireTrac by an equivalent, i.e., the double-step trailing edge. A reasonable fact finder could find infringement by equivalents because, based on the Milster report, a reasonable fact finder could find the differences between the allegedly infringing device and the claimed invention to be insubstantial. We therefore conclude that the grant of summary judgment of noninfringement under the doctrine of equivalents was improper.

Del Mar contends that the district court properly rejected ODC's claim of infringement under the doctrine of equivalents based on our decision in *Tronzo v. Biomet.* As already seen, the district court cited *Tronzo* when it concluded that a ramped trailing edge was critical to the invention claimed in the '129 patent, with the result that Del Mar's double-step trailing edge waveform fell outside the boundaries of the invention and therefore could not infringe under the doctrine of equivalents.

*Tronzo* involved a patent for an artificial hip socket that included a cup implant adapted for insertion into a hip bone. *See Tronzo*, 156 F.3d at 1156, 47 USPQ2d at 1830–31. The patent in suit issued from an application that was a continuation-in-part of, and claimed priority to, an earlier filed parent application. *See id.* at 1157,

---

5. Thus, this is not a case where the nonmoving party merely presents a conclusory assertion of a genuine dispute of material fact. *See Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317, 51 USPQ2d 1590, 1594 (Fed.Cir.1999) (affirming district court's grant of summary judgment where only evidence on infringement under doctrine of equivalents was con-

clusory statement of plaintiff's expert); *cf. W.L. Gore & Assocs. v. Garlock, Inc.*, 842 F.2d 1275, 1280, 6 USPQ2d 1277, 1282 (Fed.Cir. 1988) ("Where the evidence of infringement consists merely of one expert's opinion, without supporting tests or data, the district court is under no obligation to accept it.").

47 USPQ2d at 1832. Priority to the parent application was required to avoid intervening, anticipating prior art. *See id.* at 1158, 47 USPQ2d at 1833. Claims 2 and 10 of the patent were drawn to a cup implant "wherein the body has a generally conical outer surface." *See id.* at 1156, 47 USPQ2d at 1831. The written description of the parent application described only a conically shaped cup. *See id.* at 1159, 47 USPQ2d at 1833. The only reference in the parent written description to non-conical cup shapes was in connection with prior art, where the patentee distinguished these prior art shapes "as inferior and tout[ed] the advantages of the conical shape...." *Id.* The accused device was a hemispherical cup. *See id.* at 1157, 47 USPQ2d at 1831. A jury found the claims at issue to be infringed under the doctrine of equivalents. *See id.* at 1160, 47 USPQ2d at 1834.

Biomet appealed the judgment of infringement, challenging the district court's denial of its motion for judgment as a matter of law. *See id.* at 1157, 47 USPQ2d at 1832. We reversed the judgment of the district court. *See id.* at 1162, 47 USPQ2d at 1835–36. We determined that the evidence did not establish equivalency of hemispherical and conical cups. *See id.* at 1160, 47 USPQ2d at 1834. Although some evidence tended to show that the shape of the cup was irrelevant to achieving the desired result, Tronzo's own expert testified that various cup shapes could produce "forces that might be different." *Id.* at 1160, 47 USPQ2d at 1834. We also noted that, "[a]ccording to the expert testimony, *any* shape would be equivalent to the conical limitation of [the applicable] claims." *Id.* (emphasis in original). We stated that "[s]uch a result is impermissible ... because it would write the 'generally conical outer surface' limitation out of the claims." *Id.*

Contrary to Del Mar's position, *Tronzo* does not stand for the proposition that a claim limitation describing a specific shape of a claimed structure cannot be infringed under the doctrine of equivalents by a differently shaped structure. Instead, *Tronzo* merely applies conventional doctrine of equivalents law, including the "all elements" or "all limitations" rule.

Here, a finding that the double-step trailing edges of the FireTrac waveform are equivalent to the recited "ramped trailing edges" would not write that limitation out of the claims. The specification of the '129 patent teaches that the ramped trailing edges of the waveform cause the temperature of the medium (i.e., the dye polymer layer) to fall less abruptly and results in a master CD having symmetrical pits. If the FireTrac waveform's double-step trailing edges perform substantially the same function in substantially the same way to achieve substantially the same result, a finding of infringement under the doctrine of equivalents would be proper and would not violate the "all elements" rule. In other words, if the "ramped trailing edges" limitation is present in an insubstantially changed form in the FireTrac system, then it would be proper to find infringement under the doctrine of equivalents. This is what the district court will need to determine on remand.

### III. The Time Above Threshold Claims

The Time Above Threshold Claims are claims 21 and 24. ODC argues that the district court erred in granting summary judgment in favor of Del Mar because genuine issues of material fact exist with respect to both literal infringement and infringement under the doctrine of equivalents. In particular, ODC contends that Del Mar has offered no evidence contradicting Dr. Milster's expert opinion that the FireTrac system reduces the time above threshold as recited in the Time Above Threshold Claims. After inspecting the FireTrac system, Dr. Milster found that the FireTrac modulator drive signal was actually a combination of several component signals. Dr. Milster stated that some of these component signals were delayed so that the overall effect was to shorten the time that the modulator drive

signal was at a given amplitude for writing data onto the master CD. In the conclusion of his report, Dr. Milster stated: "I believe, based on this inspection and my experience, that claims 21 and 24 are literally infringed and that this will be confirmed when the master disc created during the inspection is analyzed. . . ."

Del Mar responds that ODC has produced no evidence that Del Mar infringes. It asserts that ODC did not produce any facts to rebut Del Mar's evidence that the FireTrac laser write signal does not shorten the time the signal is above threshold, as stated in the depositions of Mr. Joyce and Mr. Golding.[6] Therefore, according to Del Mar, there were no disputed issues of fact and summary judgment was proper.

▇▇▇ The district court limited its claim construction to observing that claims 21 and 24 involve "producing a modulator drive signal which decreases the time that the signal is above threshold." *Optical Disc*, slip op. at 9. Claim 24 is representative of the Time Above Threshold Claims and recites, in pertinent part, the step of:

> *producing a shaped modulator drive signal by* increasing the peak power of the writing beam responsive to the occurrence of said leading edges, *decreasing the time said shaped modulator drive signal is above threshold* to maintain a prescribed duty cycle in the track of surface effects in the moving recording medium, and producing a symmetrical geometry at the leading and trailing edges of said track of said surface effects.

'129 patent, col. 16, ll. 59–67 (emphasis added). The plain meaning of "decreasing" is "becoming less and less." Webster's Third New International Dictionary 588 (1986). Thus, as the district court recognized, the use of the word "decreasing" indicates that the inventors intended to shorten the time the modulator drive signal is above threshold.

More specifically, referring to the waveform of the modulator drive signal, the "SUMMARY OF THE INVENTION" states that "the amplitude of the steep leading edges of the shaped modulator drive signal represent increased peak recording power, while the selection of the point at which the slope of the trailing edges passes threshold relative to the steep leading edge sets the duty cycle of the recorded indicia (pits)." '129 patent, col. 7, ll. 19–22. The "DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT" states that "[t]he *timing of its trailing edge is purposely foreshortened* to compensate for the increased length of the pit due to the higher-than-normal power level [of the leading edge boost]." *Id.* at col. 9, ll. 49–52 (emphasis added). Thus, the time the modulator drive signal is above threshold is decreased by shortening the timing of the trailing edge of the modulator drive signal relative to the leading edge.

As far as the Time Above Threshold Claims are concerned, we conclude that there are genuine issues of material fact with respect to both literal infringement and infringement under the doctrine of equivalents. As the district court noted, Mr. Joyce testified that there is no differential delay of leading and trailing edges of the FireTrac waveform. However, as the trial court also noted, "Dr. Milster's report shows that the 'main part of the modulator pulse of the FireTrac is in fact shortened.'" Dr. Milster found that the FireTrac waveform could be separated into several parts, and that the "main part" was shortened. Dr. Milster stated that, based on his inspection he believed the Trailing Edge Claims to be literally infringed, and that such infringement could be confirmed upon inspection of the master disc created during testing of the FireTrac. As noted above, Del Mar has not released this disc to ODC for inspection. In view of the conflicting testimony, we are not prepared

---

6. Mr. Joyce testified that there is no differential delay between the leading edge and the trailing edge of the FireTrac writing signal, and therefore no shortening of the pulse. Mr. Golding's testimony was to the same effect.

to say that no reasonable jury would believe Dr. Milster. Therefore, viewing the evidence in the light most favorable to ODC, there is a genuine issue of material fact that precludes summary judgment.

## CONCLUSION

The judgment of the district court is affirmed-in-part, vacated-in-part, and remanded. We (1) affirm the judgment of no literal infringement of claims 1, 3–11, 13–20, 22, and 23 of the '129 patent; (2) vacate the judgment of noninfringement of those claims under the doctrine of equivalents; and (3) vacate the judgment of noninfringement, both literal and under the doctrine of equivalents, of claims 21 and 24 of the '129 patent. The case is remanded to the district court for determination of the issue of infringement of claims 1, 3–11, 13–20, 22, and 23 under the doctrine of equivalents, for determination of the issue of infringement of claims 21 and 24, both literally and under the doctrine of equivals, and for further proceedings consistent with this opinion.[7]

*AFFIRMED–IN–PART, VACATED–IN–PART, AND REMANDED*

## COSTS

Each party shall bear its own costs.

---

[7]. We note that validity of the '129 patent is an issue that has not yet been decided by the district court.