**MSM INVESTMENTS COMPANY, LLC, Plaintiff–Appellant,**

v.

**CAROLWOOD CORPORATION, G. Rex Bailey, Stephen J. Locke, and Vidot Enterprises, Inc., Tri Medica International, Inc., Natural Balance, Inc. (doing business as Pep Products, Inc.), and John Turner, Defendants,**

and

**Nurgetics, Inc. (now Bio Synergy Neutraceuticals, Inc.), Defendant–Appellee.**

No. 00–1092.

United States Court of Appeals, Federal Circuit.

DECIDED: Aug. 9, 2001.

William A. Birdwell, Birdwell, Janke & Durando, PLC, of Portland, OR, argued for plaintiff-appellant. With him on the brief was Allen Field. Of counsel on the brief were Jeffrey M. Batchelor, Jeffrey M. Batchelor, P.C., of Portland, OR; and Bruce S. Osterman, of San Francisco, CA.

Michael T. Platt, Patton Boggs LLP, of Washington, DC, argued for defendants-appellees. With him on the brief was Andrew M. Friedman.

Before MICHEL, LOURIE, and LINN, Circuit Judges.

LOURIE, Circuit Judge.

MSM Investments Company, LLC appeals from the decision of the United States District Court for the Northern District of California granting Nurgetics, Inc.'s motion for summary judgment that the claims of U.S. Patent 5,071,878 are invalid under 35 U.S.C. § 102(b). *MSM Invs. Co. v. Carolwood Corp.*, 70 F.Supp.2d 1044 (N.D.Cal.1999) (order granting defendants' motion for summary judgment of invalidity). Because the district court did not err in concluding that the claims of the '878 patent are invalid under 35 U.S.C. § 102(b), we affirm.

## BACKGROUND

MSM Investments is the assignee of the '878 patent, which relates to a method of using methylsulfonylmethane ("MSM®") to enhance the diet of an animal. '878 patent, col. 1, ll. 26–28. Claims 1 and 5, the only independent claims at issue, read in relevant part as follows:

> 1. A method of *feeding* . . . an animal which comprises providing to the animal for ingestion a beneficial amount of methylsulfonylmethane which is in addition to any amount present as a naturally occurring constituent in the foodstuff ingested by the animal.

> 5. A method of *increasing the amount of metabolizable sulfur* ingested by an animal which comprises providing to the animal for ingestion thereby a *beneficial amount* of methylsulfonylmethane which is exogenous to and which is in addition to any amount thereof which is present as a naturally occurring ingredient of the foodstuff sources thereof ingested by the animal.

*Id.* at col. 28, ll. 10–14, 22–28 (emphasis added). During prosecution, the applicant amended claim 1 by replacing the phrase "enhancing the diet of" with the term "feeding" to overcome an indefiniteness rejection under 35 U.S.C. § 112, ¶ 2. *MSM Invs.*, 70 F.Supp.2d at 1046–47; Paper No. 4 at 1.

According to the written description, MSM® has "multiple functions in the body." '878 patent, col. 3, ll. 67–68. Specifically, "[a]t low levels of ingestion, it functions as a normal dietary ingredient, viz., as a food or food ingredient; at higher levels it functions as a pharmaceutically active agent." *Id.* at col. 3, l. 68 to col. 4, l. 3. In addition to disclosing the use of MSM® as a dietary supplement for nutritional purposes, the written description

also discloses multiple examples of pharmacological benefits derived from the ingestion of MSM®. *See, e.g., id.* at col. 13, l. 53 to col. 14, l. 62.

The '878 patent claims priority from a chain of nine earlier-filed applications and has an effective filing date of September 14, 1982. *MSM Invs.,* 70 F.Supp.2d at 1047. More than one year prior to that date, Dr. Stanley Jacob publicly administered MSM®, via oral ingestion, to human patients at the Oregon Health Sciences University ("OHSU") clinic. *Id.* at 1048. As early as February 1981, Dr. Jacob administered MSM® as a pain reliever by mixing up to one-half teaspoon (roughly two grams) of MSM® in powdered form with water or orange juice. *Id.*

Prior to assigning his rights to MSM Investments, Robert J. Herschler, the sole named inventor of the '878 patent, filed suit against Foodscience Corporation alleging, *inter alia,* infringement of U.S. Patent 4,616,039, a related patent in the chain of priority of the '878 patent. *Herschler v. Foodscience Corp.,* No. 90–84 (D.Vt. Nov. 5, 1992) ("*Foodscience I*"). In *Foodscience I,* the district court held that the asserted claims were valid and infringed. Claims 1 and 5 of that patent read:

> 1. A method of providing a source of metabolizable sulfur to an animal whose diet comprises sufficient processed food to render the animal's diet deficient in metabolizable sulfur, which comprises physically admixing with one or more foodstuffs ingested daily by the animal, prior to the ingestion thereof by the animal, an amount of methylsulfonylmethane to at least 0.01 mg/kg of body weight per day.

> .       .       .       .       .

> 5. A method of improving the overall state of health and resistance to disease of an animal maintained on a diet which supplies naturally occurring methylsulfonylmethane in amounts insufficient to maintain body levels thereof in the animal of at least 1 ppm, which comprises administering orally thereto and thereby adding to the diet of the animal an amount of methylsulfonylmethane effective to maintain these body levels at least 1 ppm.

'039 patent, col. 28, ll. 44–51, 58–66. With respect to validity, the court concluded that Foodscience had failed to prove that the claims of the '039 patent were invalid based on prior public use at the OHSU clinic. On appeal, this court affirmed the district court's judgment on infringement, but reversed part of the judgment on validity. *Herschler v. Foodscience Corp.,* No. 93–1138, 1995 WL 490283 (Fed.Cir. Aug. 16, 1995) (table) ("*Foodscience II*"). We concluded that the claims of the '039 patent that were limited to non-human use (*i.e.,* use by a herbivore) were not invalid, whereas the claims that included human use were invalid "based on prior public use at the [OHSU clinic]." *Id.* at *1. The claims that included human use in that patent were quite similar to those at issue here, reciting methods of "providing a source of metabolizable sulfur" and "improving the overall state of health and resistance to disease of an animal." '039 patent, col. 28, ll. 44–45, 58–59. Such language was held to encompass the prior public pharmaceutical use.

MSM Investments brought the present suit against Nurgetics and several other defendants (collectively, "Defendants"), alleging infringement of claims 1–8 of the '878 patent. *MSM Invs.,* 70 F.Supp.2d at 1045. In response, Defendants moved for summary judgment of invalidity under 35 U.S.C. § 102(b) based on Dr. Jacob's public use more than one year prior to the effective filing date of the '878 patent. *Id.* The district court granted Defendants' motion, concluding that Dr. Jacob's activities at the OHSU clinic constituted a prior "public use" under 35 U.S.C. § 102(b) that

rendered the claims invalid. *Id.* at 1057. MSM Investments now appeals from that decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (1994).

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). For purposes of the motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We review a district court's grant of a motion for summary judgment *de novo. Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315, 47 USPQ2d 1272, 1275 (Fed.Cir.1998).

■ On appeal, MSM Investments argues that the district court erred in granting Defendants' motion for summary judgment of invalidity because the claims of the '878 patent are limited to the nutritional use of MSM®, whereas Dr. Jacob's activities at the OHSU clinic were limited to pharmaceutical or pharmacological uses of MSM®. MSM Investments contends that the district court misconstrued claims 1 and 5 by concluding that they were not limited to nutritional uses of MSM®. MSM Investments asserts that, given its ordinary meaning, the term "feeding" in claim 1 means "to give food to; to supply with nourishment." MSM Investments also contends that the phrase "a beneficial amount of methylsulfonylmethane" in claims 1 and 5 should be construed as meaning "the amount of MSM® that produces a nutritional benefit."

Nurgetics responds that the district court did not err in determining that the term "feeding" does not limit claim 1 to the use of MSM® for nutritional purposes. Nurgetics also asserts that the district court properly interpreted the phrase "beneficial amount of methylsulfonylmethane" in claims 1 and 5 to mean "any nonzero amount of methylsulfonylmethane that does not occur naturally in food actually eaten by an animal." Nurgetics further responds that because the claims do not include a nutritional use limitation, they are rendered invalid under 35 U.S.C. § 102(b) by the prior public use of MSM® by Dr. Jacob at the OHSU clinic.

■ Because the parties do not dispute that Dr. Jacob publicly used MSM® to treat pain more than one year prior to the effective filing date of the '878 patent, the sole issue on appeal is one of claim construction: whether the terms "feeding" and "beneficial amount" limit the claims to the use of MSM® for nutritional purposes. Claim construction is an issue of law, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71, 34 USPQ2d 1321, 1322 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that we review *de novo. Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1172 (Fed.Cir. 1998) (en banc). In interpreting claims, a court "should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1577 (Fed.Cir.1996). Claim terms are to be given their ordinary and accustomed meaning "unless it appears from the specification or the file history that they were used differently by the inventor." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1577, 27 USPQ2d 1836, 1840 (Fed. Cir.1993).

■ As always, our claim construction analysis begins with the actual words of

the claim. *E.g., Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d 1324, 1334, 54 USPQ2d 1289, 1295 (Fed.Cir.2000) ("We begin the claim construction process by considering the words of the claim itself.") (citing *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 619–20, 34 USPQ2d 1816, 1819 (Fed.Cir.1995)); *Vitronics*, 90 F.3d at 1582, 39 USPQ2d at 1577 ("First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention."). We agree with MSM Investments that the ordinary meaning of the term "feeding" would indicate that the method in claim 1 entails supplying or providing food or nourishment. *See, e.g.,* Webster's II New Riverside University Dictionary 469 (1988) (defining "feed" as "**1. a.** To supply with nourishment . . . **b.** To provide as food or nourishment").* Thus, the ordinary meaning of the term "feeding" provides some support for MSM Investments' argument that the method in claim 1 is limited to the use of MSM® for nutritional purposes.

■ However, claim language must always be construed in light of the specification. *Vitronics*, 90 F.3d at 1582, 39 USPQ2d at 1577 ("[I]t is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning."); *Markman*, 52 F.3d at 979, 34 USPQ2d at 1330 ("Claims must be read in view of the specification, of which they are a part."). Contrary to the ordinary meaning arguably suggested by its dictionary definition, when viewed in light of the specification, we conclude that the

term "feeding" does not limit claim 1 to nutritional uses, nor does it exclude the use of MSM® for pharmaceutical or pharmacological purposes. *See Vitronics*, 90 F.3d at 1584 n. 6, 39 USPQ2d at 1578 n. 6 ("Judges may . . . rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."). While the written description does not specifically define the term "feeding," it does disclose that MSM® may be used "as a food and as a normalizer of biological function," '878 patent, col. 7, ll. 53–56, and although its use as a "food" suggests that MSM® may be used for nutritional purposes, the written description broadly defines the word "food" as meaning "a nutritive material taken into an organism for growth, work, protection, repair, restoration and maintenance of vital processes." *Id.* at col. 8, ll. 20–23 (emphasis added). This expansive definition of the word "food," coupled with the disclosed use of MSM® as a "normalizer of biological function," clearly suggests that the claimed method of "feeding" includes both nutritional and pharmacological uses. Indeed, in addition to stating that MSM® may be used as a "normal dietary ingredient," the specification also explicitly states that MSM® has "multiple functions in the body" and that "at higher levels [of ingestion] it functions as a pharmaceutically active agent." *Id.* at col. 3, l. 67 to col. 4, l. 3. The written description explains that "[t]he major differences between the use of [MSM®] as a food and as a normalizer of biological function is the concentration and amount employed, dosage forms, and routes of systemic entry." *Id.* at col. 7, ll. 53–56.

* Standard dictionary definitions indicate ordinary meaning. *E.g., Optical Disc*, 208 F.3d at 1335, 54 USPQ2d at 1295 ("For such ordinary meaning, we turn to the dictionary definition of the term.") (citing *Vitronics*, 90 F.3d at 1584 n. 6, 39 USPQ2d at 1578 n. 6 (explaining that although dictionaries are extrinsic evidence, "[j]udges are free to consult such resources at any time in order to better understand the underlying technology")).

Furthermore, the written description provides numerous examples of specific pharmacological benefits derived from the ingestion of MSM®. *E.g., id.* at col. 13, l. 53 to col. 14, l. 62 ("The following are pharmacological benefits from the ingestion of exogenous methylsulfonylmethane . . . ."). These examples range from relieving various types of pain and treating parasitic infections to improving the overall health of animals. *Id.* The specification states that these pharmacological benefits may be effectuated by adding MSM® to the "daily diet" of the patient, *id.* at col. 20, ll. 3–11, or by administering MSM® "in admixture with one or more foodstuffs ingested daily by the patient, e.g., milk, coffee, tea, cold desserts, etc.," *id.* at col. 22, ll. 60–68. It is also clear that animals may be administered pharmaceuticals by including them in their animal feed. *E.g., id.* at col. 10, l. 58 to col. 13, l. 52. Such examples erase the distinction that MSM Investments attempts to create between the use of MSM® as a nutritional food or dietary supplement and the use of MSM® for pharmacological purposes.

MSM Investments argues that the examples of pharmacological uses of MSM® in the specification "were actually examples of different inventions claimed in different, but related, patents," and that the district court's "improper reliance" on these examples led to an erroneous claim construction. However, that argument is unpersuasive. According to its own written description, the '878 patent discloses additional examples of pharmacological benefits that were not disclosed in parent applications. *Id.* at col. 2, l. 67 to col. 3, l. 5 ("[I]n addition to the pharmacologically beneficial effects [of] methylsulfonylmethane . . . which are specifically disclosed in my parent applications, it is useful in the treatment of a surprising variety of other diseases and adverse physiological conditions, as disclosed in detail hereinafter.").

Moreover, the fact that other related patents have claims that are limited to certain pharmacological uses (*e.g.*, treatment of gastrointestinal upset, nocturnal muscle cramps, etc.) does not compel the conclusion that the claims of the '878 patent must be limited to nutritional uses. While a patent specification may contain a description of separately patentable inventions that end up claimed in multiple patents, the specification of this patent indicates that the generic term "feeding" encompasses the administering of pharmaceuticals. The specification commingles pharmaceutical uses with nutritional uses and does not describe nutritional benefits and pharmacological benefits as mutually exclusive. Thus, when reading the claim language in light of the specification, the term "feeding" in claim 1 of the '878 patent covers both nutritional and pharmacological uses of MSM®.

■ With respect to the "beneficial amount" limitation, MSM Investments contends that this limitation should be interpreted as "the amount of MSM® that produces a nutritional benefit." We disagree. While the district court's construction of "a beneficial amount of methylsulfonylmethane" as meaning "any nonzero amount of methylsulfonylmethane that does not occur naturally in food actually eaten by an animal," *MSM Invs. Co. v. Carolwood Corp.*, No. C 98–20238 EAI, slip op. at 8 (N.D.Cal. Jul. 23, 1999) (order regarding claim construction), misses the implication of the word "beneficial" that the amount must "promote a favorable result" for the animal, the claim language plainly encompasses both pharmacological and nutritional benefits. Furthermore, the written description explains that while it is desirable to ingest "from about 0.5 1.0 milligram/kg body weight/day" to maintain optimum good health, "any lower level will serve some benefit." *Id.* at col. 4, ll. 60–66. The specification discloses many of such benefits, which include pharmacological bene-

fits. We therefore conclude that the district court's construction of the phrase "a beneficial amount of methylsulfonylmethane," while incomplete, at most constituted harmless error.

## CONCLUSION

Accordingly, we agree with Nurgetics that the district court correctly concluded that claims 1 and 5 are not limited to nutritional uses of MSM®. Moreover, because the parties do not dispute that Dr. Jacob publicly administered MSM® as a pain reliever more than one year prior to the effective filing date of the '878 patent, the district court did not err in granting summary judgment that the claims of the '878 patent are invalid under 35 U.S.C. § 102(b). We therefore

*AFFIRM.*